Good morning. May it please the Court. My name is Marjan Bahmani. I represent Karapetian, this case. This case basically turns on the issue of credibility, and the immigration judge had basically three issues with this case. One was the fact that the fire that they basically testified to, there was no documentary evidence, and the father of the petitioner did not attest to that fact during the hearing, even though he was found credible on other matters. So let's talk about that. The petitioner has brought evidence from Armenia to this regard. We submitted a motion to reopen with the Board. We have two very important documents. One was from the fire department. The other one was from witnesses in Armenia who lived in that building. But the problem was that that wasn't submitted until much later, right? I understand, Your Honor, but these are asylum applicants. They flee their country of persecution. And usually these kind of documents are very hard to obtain. So just because they were available doesn't mean they were obtainable. They had to obtain this at great hardship. They had to find family members in Armenia who would have to go and retrieve these documents. They were in Armenia to get them. So they had to undergo tremendous hardship to get this. So what would be – what is your argument about – I understand the concern, but there's a time limit on filing the motion to reopen, and you didn't meet it. Is there a reason – I understand the reason, but is there a legal basis for what that is? Yes, Your Honor, due process. I believe that Karapetyan deserved to have all documents, all testimony that was favorable to her, presented to the court. The only reason she was deprived in doing so is because she was here in the United States in the Holocaust of Persecution. But she didn't submit it at the original hearing. And for that, there was no – a long period, right? She couldn't obtain it at the original hearing, Your Honor, no. She didn't have family member in Armenia at the time. She had to obtain it, and she was able to obtain it much later. That's why it was – I believe it was the board's – the board should have used its discretion in at least looking at the documents, because basically the credibility issue was shot on this issue, on the document, lack of documents on this issue. Now, the next issue that the immigration judge had a problem with was the beating of the son. The son testified that he was beaten once. The grandfather testified that he was beaten once. And the mother in court said that he was beaten once. But the asylum application stated that he was beaten several times, like every day. But the asylum application was filled out by a notary. At the time, the mother – Is that on the record that it was filled out by a notary? A lot of immigrants, immigrants, when they come to this country, they don't know that notaries are not attorneys. No, no. I understand that. But I looked to see if it was done by a notary, and I didn't see anything in the record that said that. Yes, Your Honor. I did say it in my brief. It was filled out – it was filled in by a notary. You said it in your brief that we're looking for some evidence in the record. I see. I must have evidence in the record on this. Now, if you can find something in the record during the – your opponent's argument, that would be helpful. Yes, Your Honor. I could do that once – Yes. Yes, once – yes, exactly. You see, on each of the three items of adverse credibility, the frequency of the attacks, the reason she was forced to resign, and the burning of the apartment all involve some inconsistencies, do they not? Yes, Your Honor. And my question is, why should we land on your side of the inconsistencies rather than the other side? Because none of these inconsistencies goes to the heart of the claim. They all are incidental to the claim of asylum. The claim of asylum is based on the beating of the son. How many times he was beaten and by whom he was beaten is not relevant. Or it may be relevant, but it's not central to the claim. As well as the – Well, it is, in fact. I mean, that's not so, because – Well, if he was beaten once, Your Honor, by individuals because of his mother's religious activities, that one beating is still persecution. It doesn't change the fact that he was beaten, and it doesn't change the fact that it was on account of one of the – one of the religious groups. Right. The problem here is that the judge found that because her story was confused or if her story – and that was his view, was that her story was confused, so he didn't believe his story. He didn't believe that he was beaten even once because sometimes she said once and sometimes she said twice and sometimes, you know, and so on. That was the problem. But, Your Honor, the immigration judge did not say that he didn't believe he wasn't beaten. He said that because the story was different each time, according to the – I mean, she wasn't credible, i.e., I don't believe you. I – that's not what he said in his oral, you know, oral statement, Your Honor. And he's – and Judge Einhorn is very specific when he does not – when he wants to say someone is not credible based on a certain fact, he lays it down. He's one of the most articulate judges we've had in court. So he retired now. And then the question becomes, by whom was he assaulted? And were there any authorities of the government involved? Yes, that is true. But we didn't – the judge didn't even get that far on this level. The son testified that he was beaten by individuals because of her mother's religious beliefs. After that, these are people – even if they're not people associated with the government or related to the government, the fact that the government could not control them makes her eligible for asylum in this case. Were claims made to the government? Well, the – originally, she did go to the police station. But after a while, after the police did not help her, every time some incident  because it was futile. The police could not help her. There's some indication that the word attacks, as used, were verbal attacks. Is that correct? No, Your Honor. My client – I mean, Ms. Carapetian was arrested and taken to the station. She was beaten. She was taken to the station. Your Honor, I think what the – when she testified, she first said, yes, there were numerous insults or attacks. And then he said, how many physical attacks? And she said that it was one. That's right. There were more verbal attacks. But she – the first time, she included within attacks nonphysical attacks. And then when the judge said physical, then she said one. Yes, Your Honor, but that was also in her original asylum application. She had laid the foundation. She told the court when it was in her application that she was taken to the station and beaten. Well, you know, on the application, you know, one defense would be that it was prepared by a notary. The other defense that she included when she said daily attacks, she meant both physical and nonphysical. It's a different defense, but it's a little harder to make given what she said in the application about the daily attacks. It was the daily – the application talks about the daily attacks to her son. Well, when faced with a credibility question like that, and the I.J. comes down on one side, do we have any reason to say that his factual findings are wrong? Your Honor, I have – we have now documentary evidence. That's what I submitted to the court. We have documentary evidence now showing that her apartment was burned. Well, wait a minute. We're on beatings now. Okay. I'm sorry. Yes. But you see, one false assumption follows the other. For example, if we have the problem with the beating of the son, then we have the apartment who the judge doesn't know whether it was a burning arson or wasn't because the testimonies are not the same. Then we have added to that other elements. It takes away from the credibility. That's why it's there. Well, how about, for example, the teaching job? There are inconsistencies there. She said to close the school. They had no heat. A whole – you have several different stories there, too, don't we? Yes. But the judge found the father of Karapetyan Vladimir credible on this issue. And he did testify, and he testified completely on this, that her daughter was – had problems because of her Russian orientation. That she was fired from the school? That she was fired from the school. How would he know that? Her daughter told him. At this point – okay. The problem – I'm sorry. Yes. I understand your frustration with regard to the documents on the burning, but I don't see any legal basis for us dealing with it at this point. Your basic submission was to the BIA and for them to deal with it sua sponte despite the time limits, and they didn't do it. And our case law doesn't permit us to interfere with that. So what are we supposed to do about it? If you made a suggestion, it would be helpful. Then I think that even without the documentary evidence, looking at the record, I don't think that Respondent should have been – I mean, Petitioner should have been found not credible. There are instances in the case. There are lots of testimony as to the beating. There is lots of testimony as to the fact that she was fired from her job and not, you know, resigned from her job because they forced her to, as opposed to the school's closing down. There's enough evidence in the – in the brief, in the case. She should not have been found credible. What other thing is – I mean, reading through this transcript, it does seem to me that the judge was incredibly rude to your client from the minute she walked in the courtroom, whether there was some history behind it or what. I don't know. But I do not understand you to be raising a separate due process issue at that point. Isn't that right, at this point? Yes. Are we – okay. We did raise it originally. I mean, I wasn't the attorney of record originally regarding the judge, but you have to understand that Judge Einhorn is a – was a wonderful judge, was one of the most respected judges in the Court, but if there was a day that he was not in a good mood, that would be horror and misery for all of us. Usually that happened maybe a few times in a year, but it happened. You need to know this because that's one issue. One of the other issues that I had a lot of problems with was the fact that the judge keeps speculating, and that is not allowed, not in our case now, not in this circuit. He also kept interrupting her so that, for example, on the question of why she was Yes. And then the judge speculated on the fact that because she received a subpoena once and why she didn't receive subpoenas at other times, that that shows that she was incredible. That's pure speculation. And I have, you know, in my brief, I completely discussed this because I come from a country, you know, I come from Iran. We don't have the same rules and regulations there that United States and democratic countries have here. So I discussed this in my brief. That was pure speculation. Of course, the I.J. pressed her for answers because he was concerned that she wasn't answering directly. He might have gotten a little testy, but he said, I'm a simple man, I need simple answers, and tell me, and so he pressed her for answers. I don't know whether I would characterize that as a nasty approach or not, but he certainly listened to her story. Your Honor, the immigration judge might be a simple man and he may want a simple answer, but the answer may not be simple. Just because he wants it doesn't mean that the answer would be simple. The answer involved years of situation with the Russian background. She had to explain that fact to the judge by intimidating the Petitioner how you're going to get a, you know, direct answer. That's actually the opposite of what would happen. If you intimidate an asylum applicant in a court of law, she wouldn't be able to speak back to you. She wouldn't be able to discuss this. How well did your client speak English? Not at all, Your Honor. Even at the time. Was there a translator? Even at this stage. At the hearing. At the hearing, she didn't. She spoke very little. No, but was there a translator at the hearing? There was a translator at the hearing, and my — and the parapetian asked for a different type of translator. The translator spoke a different dialect of — of Armenian, and she couldn't understand. And that wasn't taken care of either. She was — she had to respond to the translator with a different dialect. Yeah. I wondered as I read the transcript if it seemed to be there were — Yes, Your Honor. In her — in her appeal to the Board of Immigration Appeal the first time, I was the — I was in the attorney of record at the time, but at the first appeal, she did raise the issue of a translator. She said the judge wouldn't let me speak, and then I asked the judge for a different translator. I didn't understand the translator, and it wasn't, unfortunately, changed. The translator wasn't changed. All right. Thank you, Karen. Thank you. Good morning, Your Honors. May it please the Court, Charles Kander on behalf of the Attorney General. Regarding the evidence submitted in the motion to reopen, the Court has no jurisdiction to consider the denial of the motion to reopen. First, I would stand on our position in our brief that the petition for review of that decision was not timeless. There's no — the government's records I can represent to the Court. We have no records of a petition for review being served on the government at the time she allegedly tried to file first in January. The only petition for review that we have is received — was the copy, the Court's I don't think it makes much difference. As to the fire, I think the problem is that the father, when asked whether any unusual events happened at the apartment, also seemed — he was elderly and frail, and his answer was not very clear. But he did say the people were attacking the house. He said a lot of unusual things happened. So many things happened. And then the next question afterwards, he said the house was attacked. So he didn't say fire. And it's not as if he contradicted it. His answer, this was his sister's house? It was her apartment. She was staying at the time of the — she claimed that at the time of the fire, she was at her sister's house when the apartment actually caught on fire. It was her apartment that she claimed burned. And I think that — So the father didn't say — he didn't say there was no fire. He was asked whether anything's happened, and he said, yes, a lot of things happened, and they were attacking the house. I don't see that that's a contradiction of the fact that there was a fire at the apartment. Respectfully, Your Honor, I would disagree. First, the son, Mr. Agamalian's testimony, he was specifically asked, pages 176 and 177 of the record, other than this incident, that is, the alleged beating in November, this attack. Did anything in the things being said to you in school, did anything else happen to you in Yerevan that you'd like to tell the Court, or in Armenia, I'm sorry, that you'd like to tell the Court? Well, the answer, well, other than the constant humiliation and the constant emotional — emotional, you know, state that I was in, and other than that, no. Well, he could easily have understood that question to be what happened to you.  That's what it said. I believe that any — he was asking, other than the incidents that you've described, did anything else happen? Nothing else happened to you. And he answered, well, I was humiliated, and so on. This is, you know, a young person, and he was going to be somewhat self-centric. Your Honor, at the time — Did anybody ask him whether there was a fire at the apartment? Yes. Then the follow-up question was — I believe the follow-up question was something along the lines of what about the fire. Where were you when your apartment was burned down? I was with my mother at my mother's house. Well, that's her testimony, not the grandfather. But one would think — one would think that when the grandfather was asked specifically about the apartment, one would think that such an important event as a fire would be mentioned. Well, I agree, Your Honor, and that's why, in addition to the fact that Mr. Agamalian did not mention the fire until specifically asked, when the father was asked, he was asked 185 and 186 of the record, anything else happened to her in Armenia? She was hiding from things, hiding things. She didn't tell me everything. I remember that my grandchild was beat up, and there's some follow-up there. Aside from your daughter being fired, did anything else happen to your daughter that you know of? Again, he does not mention the fire. Then he was asked about the apartment. Does he know about the apartment? Is he familiar with the apartment? Do you live near the apartment? I remember the place very well. I used to go very often. Do you remember anything unusual happening to that apartment, to that place? So many things happened that I don't know. Did you say that you visited the place a lot? Do you have any recollection of anything unusual ever happening to or at the place your daughter lived? I don't remember. Then he says, I know people were going there and they were attacking the house. Well, I think that's a general statement. And he's been specifically asked, did anything happen? The natural ---- And she also said several different times that she was hiding things from him. But, Your Honor, it was four months between when the ---- And she also says, I run away from my apartment and she did from hers because it was dangerous there. So he knew that she wasn't living there. By the time they left in February. But there was four months between November and February that when the alleged fire took place and when they actually left. And the natural response to the question, are you familiar with the apartment? Did anything happen to the apartment? It burned down would be the obvious answer. If he knew, yeah. And then he was asked on redirect. Could I ask? I didn't really understand what you said at the very beginning. Yes. About the motion for a hearing. You're saying you never were served with a motion for a hearing at all? The government doesn't have one? Your Honor, the petition for review of the denial of the motion to reopen, the government's record ---- in our records, we do not have an original that was served by Petitioner on us at the time. She claims that she filed it or tried to file it on January 28, 2005. But you do have the motion to reopen. Oh, yeah. In the record, Your Honor. And the documents attached and so on. Yes, yes. But back to the fire. He was asked to clarify on page 189, 190. Let me back up for a minute on that. All right. So this is the central question. And I actually don't ---- haven't looked at the documents. I don't know how persuasive they are. But, I mean, if they were on their face persuasive or even arguably so with regard to this central question, why wouldn't the board reopen on it? I understand we don't have review on all that, but it seems awfully peculiar to want to send somebody back to Armenia if, in fact, her house was burned down and she has proof of it. At least you'd want to find that out, wouldn't you? Well, Your Honor, I think the board ---- what the board's actual, you know, what ---- how they consider these documents, to what extent they consider these documents, you know, we can't be sure because they denied it on a perfectly legitimate basis that it's unfinely. But they have the authority to consider it if they wanted to. They have the authority at any time to, yes, to reopen Sue Esponti. But they decided not to. That's not saying that they didn't consider the documents, you know, in deciding that and think that either, A, they don't appear, you know, authentic or simply they think it's ---- The board may have thought that that wasn't a really very important reason for the credibility determination. They did have some other grounds, and they might have recognized that that one was a pretty weak one anyway. Well, perhaps, Your Honor, I think ---- The board was speculating as to what the board ---- Exactly, Your Honor. I think, yes, we are kind of getting far afield of what may or may not have happened but I disagree that the fire is ---- I'm not sure that you can find a more clear example of ---- Well, if that's the clearest example, I, for one, would not find it a sufficient basis for credibility determination. So if that's the clearest, that helps me answer this case. Well, with respect, Your Honor, I don't believe that the record could compel the conclusion that that ---- Well, you know, the grandfather's testimony is a little murky. He's elderly. He didn't live there. He said his ---- they said his daughter didn't tell him all of the things because he had a heart condition. He was elderly. Your Honor, I think ---- And the other witnesses testified there was a fire, and nobody asked him directly was there a fire. So if that's the strongest case, that's helpful. Your Honor, I think that this ---- I think that the other grounds are certainly sufficient as well. With respect to the ---- But not as strong as this, you said. You said this is the strongest you could possibly find? This is the ---- I believe that this is as strong a ground as you would find in any other case where the respondent was caught clearly fabricating, clearly lying. But let's be really specific about it. What would the ground for not believing her is because, what, because the grandfather didn't say there was a fire? The ground for not believing her, Your Honor, is all of the grounds stated in the immigration judge's decision. Right. Among the ---- that is, that she stated my son was beaten many times in her ---- No, no, no.  No, I'm talking about this ground. Just the fire. In the fire, yes. I think it's both that she's the only one that testified specifically to it. No, her son testified. Once he was asked what, you know, and what about the fire. But when he was asked the direct ---- the question that was clearly trying to get out the fire. How old was the son at the time of the fire? At the time of the fire, I believe the son was around 12 to 13. Right. And if you ask a 12- or 13-year-old, what happened to you? I mean, the fact that the ---- He was, Your Honor, he was not 12 or 13 when he was asked about the ---- when he was asked this. I understand that. But looking at it from the point of view of what he was thinking of when he was affected by it. And I can ---- it just seems totally believable to me that if you ask a 12-year-old or ask somebody about when they were 12 what happened to you, the fact that their house burned down is ---- Well, Your Honor, I believe ---- It's a different category of issues. It's not what happened to you. Well, Your Honor, with respect, you might ---- you might believe that that would be the case. I don't believe that you would ---- that any reasonable fact finder would be compelled to reach the same conclusion. And that's the standard. Particularly because he didn't say he did eventually ---- not eventually. He immediately said that there was a fire. He didn't say, oh, there was no fire. And nobody ever said to him, well, why didn't you say it right away? I mean, that's a ---- It's established in the record that this was an arson fire. It is not established in the record other than apart from the later filed documents. Well, did those documents say it was arson? The documents indicate that it ---- to the extent that the documents are authentic, it does state that it was ---- they believe it was set by unknown persons. Your Honor, I think regarding the father, I realize my time is up, but I just would like to direct the Court to Mr. Kerepichian's testimony on page 190. And I think this is what this case is really about. This is why the Petitioners are here. The father is a veteran of World War II. He, upon Armenian independence, veterans' benefits were cut off. He agitated. He and some others agitated for more benefits. The government responded harshly. He was beaten. I think one of his other veterans was killed. And if you look at page 190, this is after he's ---- this is after questioning is completed. Mr. Kerepichian is kind of going on on his own. There were some things that happened that just something roughed up everything. There was an incident when one of our veterans was killed, was beat up and killed. There was a meeting during this funeral, and I was told not to disturb people. And the immigration judge, sir, you're talking about your own problems. The problem that ---- that problem that became everyone's problem. Immigration judge, well, I mean, you're not referring to your daughter right now, are you? Answer, my daughter, it's just that she just could not ---- simply could not live there anymore. She still thought she could have it fixed, that nobody would touch Russian schools, but she was so disturbed, she was under so much pressure. There were a lot of threats made to her that she just could not. But when I was hit, I was for a long time, how you call it, clinical death. When I could not return home and I couldn't return to her place, we just bought tickets with the help of a tribal agent, the four of us we met at the airport. I think this case, Mr. Kerepichian has received asylum. He had a valid asylum claim. He understandably frustrated with his country, the country that he had served. You know, was not only had it turned its back on his service, but then was violently responding to his and his fellow veterans' requests. He understandably took his only daughter and her son with them to the United States. Unfortunately, he had a valid claim, and the Petitioners in this case do not. The agency's decision is supported by substantial evidence, and the Petition for Review should be denied. The second Petition for Review should be dismissed. Thank you, Your Honor. Thank you. We'll give you a minute or two. Just one. As to Petition for Review, Your Honor, when we file a Petition for Review, I don't we don't send a copy to the government. The court in the clerk's office does. I have evidence. I send them a check with the Petition for Review. But because it was a second Petition for Review, they thought that it was already paid, and because of that, they returned the check. The date on this is January 31, 2005. So I did file it timely. I brought the evidence to court. That's for the Petition for Review for the motion to reopen, for the denial of the motion to reopen, Your Honor. If you would like to see the evidence, I have it. All right. Well, if we need it, we'll be in touch with you. Okay. So what is the point on that? You say it was filed in time? Yes, Your Honor. It was. It was timely filed. They just sent the check back because they thought it was already paid. They didn't realize that it's a second Petition for Review. I had already filed a Petition for Review while the motion to reopen was pending with the board. I filed a Petition for Review originally on this case within the time limit. When we got the new evidence, I filed a motion with the board. When the board denied it, I filed another Petition for Review on the motion to reopen, and later they consolidated the two Petitions for Review. In this court? In this court. Thank you. Okay. Now, if I may, I'm going back to the testimony of counsel, of government counsel. The father testified on numerous occasions that he'd been ill, that he's had heart surgery, that his daughter was trying to hide things from him that would upset him. He went on and on to discuss this. A fire to the apartment would have ‑‑ a burning down of the daughter's apartment would have certainly upset the father who'd had a heart surgery and who'd been ill. That is the reason why he didn't know about the apartment's fire. And the evidence that we have which says it was set by fire by unknown individuals specifically stated it was set ‑‑ it was a burn down by unknown individuals. So it was arson. And that's as to this. Now, as what you asked me earlier, Your Honor, on transcripts page 304, even though there is no notary on this, but it's a signature of person preparing form, if other than above, the fact that the application was filled out in English when my client spoke absolutely no English at the time. It was right when she entered the United States. And the fact that no one filled out this particular section is evidence that it was filled out by a notary. If it was filled out by a family member, they would have written it down. It wasn't done so. It was typed, Your Honor. It was typed. It was typed. It was in English. My client spoke no English whatsoever. Neither did any of her family members when they came together. So it's evidence that it was a notary. Otherwise, why would, if an attorney would fill it out, we have to put down our signature, any family member, we have to put down our signature. That is the requirement. Thank you. Thank you, counsel. The case just argued will be submitted. The next case for oral argument is Kassisian v. Mukasey. Can we have somebody call her office? All right. We'll call that again later in the calendar. The case after that is Lee v. Mukasey. Thank you.
judges: Reinhardt, Berzon, Miner